ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MICHAEL A. WERNER, M.D., DIANE WERNER, :
MAZE REALTY, LLC, WB GROUP, LLC, D&M :
GROUP, LLC, :

                     Plaintiffs,

    -against-

ROBERT SHAKMAN, TAX TITLE SERVICES,
INC., TAX TITLE SERVICES OF LOUISIANA,
LLC, and JOHN DOES #1-3,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**COMPLAINT**

12 Civ. _____

**12 CV 6715**

**JUDGE RAMOS**

Plaintiffs Michael A. Werner, M.D. ("Dr. Werner"), Diane Werner ("Mrs. Werner"),
MAZE Realty, LLC, WB Group, LLC, and D&M Group, LLC (collectively, the "Werners" or
"Plaintiffs"), by their attorneys, Garfunkel Wild, P.C., allege for their Complaint against Robert
Shakman ("Shakman"), Tax Title Services, Inc. ("TTS") and Tax Title Services of Louisiana,
LLC ("TTSL") (collectively, "the Defendants"), as follows:

**THE PARTIES**

**Plaintiffs**

1.     Plaintiffs Michael A. Werner, M.D. and Diane Werner are New York residents.
Dr. Werner is a board-certified urologist and maintains offices in Manhattan, New York,
Purchase, New York and Norwalk, Connecticut. Diane Werner was until recently, President of
the Board of a local high school in Mamaroneck, New York.

2230983v.9

2.      MAZE Realty, LLC, is a New York limited liability company with its principal place of business located at 2975 Westchester Avenue, Suite G3, Purchase, New York, 10577. This entity was established by the Werners and invested with Shakman.

3.      WB Group, LLC, is a New York limited liability company with its principal place of business located at 9 Pin Oak Lane, White Plains, New York 10606. This entity was established by the Werners and invested with Shakman.

4.      D&M Group, LLC, is a New York limited liability company with its principal place of business located at 9 Pin Oak Lane, White Plains, NY 10606. This entity was established by the Werners and invested with Shakman.

**Defendants**

5.      Upon information and belief, Defendant Robert Shakman is an Arizona resident who among other things, travels around the United States soliciting business through real estate seminars. Upon information and belief, Shakman is the Vice President and Principal of Defendant Tax Title Services, Inc., and is at a minimum, part owner of Defendant Tax Title Services of Louisiana, LLC.

6.      Upon information and belief, Defendant Tax Title Services, Inc. ("TTS") is a California corporation with its principal place of business located at 4590 MacArthur Boulevard, Suite 300, Newport Beach, California, 92660. Upon information and belief, TTS is a tax lien foreclosure certification company which certifies the accuracy and completeness of tax lien foreclosures in order to ultimately issue title insurance on tax deed properties. Upon information and belief, TTS is in good standing with the Louisiana Secretary of State and maintains a

2

business establishment in Louisiana at 4532 W. Napoleon Avenue, Suite 201, Metairie, Louisiana 70001.

7.      Upon information and belief, Defendant Tax Title Services of Louisiana, LLC ("TTSL") is a Louisiana limited liability company with its principal place of business located at 4532 W. Napoleon Avenue, Suite 201, Metairie, Louisiana, 70001.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction, as the parties are citizens of different states, and the amount in controversy exceeds the sum of $75,000.

9.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the vents giving rise to the claims asserted herein occurred in this District.

## NATURE OF THE ACTION

10.      This lawsuit concerns among other things, a series of misrepresentations and fraudulent activities undertaken by the Defendants resulting in a loss of approximately $564,000, if not more, to the Werner's.

## A.      The Werners Meet Shakman At A Real Estate Seminar In New York

11.      Dr. Werner met Defendant Shakman on September 23, 2009, when Dr. Werner attended Shakman's discussion on distressed real estate at a GreenPearl real estate seminar in Manhattan, New York.

3

12.    At that seminar, Shakman, who held himself out to be an expert in selling distressed real estate, spoke about a profitable opportunity of "flipping" foreclosed houses in Florida (the "Florida Project").

13.    Following Shakman's presentation, Dr. Werner met with Shakman to further discuss Shakman's expertise, and about potentially investing in the Florida Project.

**B.    The Werners Agree To Invest In The Florida Project**

14.    Following, the New York seminar, the Werners decided to invest with Shakman in the Florida Project.

15.    In fact, following the New York seminar, Shakman was quoted in saying "GreenPearl Events' Distressed Real Estate Summit: New York unexpectedly became a great networking opportunity for me. My primary purpose for attending was as a guest speaker in a panel discussion. I ended up speaking with attendees for over an hour after the discussion ended, which resulted in **three new clients.**" *See* Exhibit A.[1]

16.    Upon information and belief, the Werners are one of the three new clients Shakman acquired in New York through the seminar.

17.    In the Florida Project, Shakman identified and notified the Werners about foreclosed properties. The Werners then purchased the homes and later "flipped" the property for a profit.

---

[1]    All exhibits are fully incorporated herein by reference.

2230983v.9

18.     All communications between Shakman and the Werners, who were in New York, were by e-mail and/or telephone, and the funds to purchase the foreclosed homes were wired by the Werners to the appropriate official at the county from which they were purchased from New York.  Likewise, all profits from the Florida Project were sent by Shakman to the Werners in New York.

## C.     Shakman Presents The Werners With A New Business Venture

19.     On the heels of the success in Florida, in or about September 2010, Shakman approached the Werners about a new Acquisitive Prescription ("AP") project he was commencing in New Orleans, Louisiana (the "Louisiana Project").

20.     The intended purpose of the Louisiana Project was to take advantage of the newly instituted AP statute for "blighted properties."  *See* LSA-R.S. § 9:5633.  A copy of the statute is attached as Exhibit B.

21.     Under this statute, a potential interest holder could acquire a lien interest in a blighted property if no challenge was raised by the property's true owner within 60 days of filing the lien with the court.

22.     Shakman represented to the Werners that he, and the attorneys working with him on the venture, Morel & Yorsch (the "Attorneys"), had extensive knowledge of the new AP statute and that this project would be extremely profitable.

23.     Relying on Shakman's representations, on September 22, 2010 and November 16, 2010, the Werners invested approximately a total of $120,000 in the Louisiana Project.  At this

5

point in time, no written contract was entered into between the parties, all communications between Shakman and the Werners who were in New York were by e-mail and/or telephone, and the funds were wired by the Werners to Shakman from New York.

**D.    Shakman Provides The Werners With Marketing Material
To Induce The Werners To Invest More Funds In The Louisiana Project**

24.    On November 28, 2010, in an attempt to induce the Werner to invest more funds in the Louisiana Project, Shakman sent marketing material to the Werners in New York, highlighting the key aspects of the Louisiana Project and promising an estimated return of the investor's "capital costs + 40% of profit." *See* Exhibit C.

25.    The marketing material provided that with AP "the investor files documents with the court which creates a lien interest in property.  There is a redemptive period of 60 days in which the owner of any interested party may redeem the investor's interest . . . . Once the 60 day period has expired and no challenge has been brought forth . . . Tax Title Services will cure any defects to the title and provide a title insurance policy through First American Title" and the investor will receive their capital costs plus 40% of profit with 120 days after the 60 AP waiting period. *See* Exhibit C.

26.    The marketing material further recommended a $100,000 minimum investment fund which "***may or may not*** include rehabilitation cost depending upon the investor's strategic plan." *See* Exhibit C (emphasis added).

27.     Finally, the marketing material provided that the "the investor *decides* whether to
rehab and sell into the retail market *or* sell 'as is' to the investor market." *See* Exhibit C, pp. 5-7
(emphasis added).

**E.    An Agreement Is Executed In New York**

28.     Upon reading the marketing material and further discussion with Shakman, on the
next day, November 29, 2010, the Werners signed an agreement with Shakman in New York
entitled "Purchase of Acquisitive Prescription Liens/Deeds" (the "Agreement"). *See* Exhibit D.

29.     Consistent with the marketing material, the Agreement provided that "[o]nce the
property . . . completed the 60 day Acquisitive Prescription program, Tax Title Services will cure
the title. The property will be sold "As-Is" *or* the property will be rehabilitated and sold into the
retail market." *See* Exhibit D (emphasis added).

30.     Further, under the Agreement all liens acquired "through Acquisitive Prescription
cost $9,370.00." *See* Exhibit D.

31.     Upon information and belief, as explained by Shakman to the Werners, the
breakdown of the $9,370 cost per AP lien was as follows: (i) $250 in expenses to run a title
search; (ii) $100-$250 for lien clearance; and (iii) up to $4,000 in attorneys fees if the AP lien
closed. Upon information and belief, the remaining balance of the $9,370 was paid to Shakman,
including the $4,000 in attorneys fees if the AP lien did not close.

32.     The Agreement also provided that "[o]nce the property is sold Client is paid all its
capital costs + 40% of profit." *See* Exhibit D.

33.    The marketing material and the Agreement were both silent as to the total amount the Werners would invest in the Louisiana Project.

34.    Before executing the Agreement, the Werner's made it clear to Shakman that they did not intend on rehabilitating any of the properties through the AP process.

35.    Shakman expressly acknowledged the Werners choice in not rehabilitating the properties, and once again represented to the Werners that no rehabilitation would be required for the AP process to be successful.

36.    Finally, in addition to the marketing material and the Agreement, Shakman also agreed to replace any property, at his own expense, which were successfully challenged within the 60 day AP waiting period, or for any reason failed to sell at more than the total cost incurred by the Werners. *See e.g.,* Exhibit E.

**F.    In Reliance Of Shakman's Representations And Assurances
The Werners Invested Substantial Funds In The Louisiana Project**

37.    Following the execution of the Agreement in New York and based on Shakman's urgings and solicitations,, the Werners decided to invest approximately another $345,000 (which was paid in intervals from December 6, 2010 through May 9, 2011) in the Louisiana Project.

38.    Accordingly, the Werner's total investment in the Louisiana Project was approximately $465,000, all of which was wired by the Werners to Shakman from New York.

8

**G.     Shakman Frequently Returned To New York To Reassure
The Werners About The Louisiana Project And To Secure Additional Funds**

39.     Though the marketing material provided that the Werner's would receive a return of their capital expenses and 40% of profit within 120 days of commencing the AP process, as of February 2011, the Werners did not receive any return on their investment.

40.     However, the Werners did not withdraw from the Louisiana Project, because Shakman continued to promise and reassure the Werners that the Louisiana Project would be profitable.

41.     In fact, Shakman repeatedly returned to New York and used these same promises and reassurances to obtain additional funds from the Werners.

42.     For example, in or about May 2011 Shakman returned to New York and met with Dr. Werner.

43.     At that meeting, Shakman reassured Dr. Werner that the Louisiana Project would be profitable with only a little more time and money, and was able to secure an additional $140,000 from Dr. Werner.

44.     Furthermore, in an attempt to further comfort the Werners and push the project ahead, Shakman recommended that the Werner's hire a third party to supervise him and the execution of the AP process. The Werners listened to Shakman, and to date the Werners have paid this employee, who was recommended to them by Shakman, approximately $64,000.

2230983v.9

**H.    Shakman Informs The Werners That
The Attorneys Misinterpreted the AP Statute**

45.    In or about March 2011, the Werners met with Shakman and the attorneys Morel & Yorsch in Louisiana. At that meeting Shakman and the Attorneys restated how excited they were about the progress of the Louisiana Project and its ultimate profitability.

46.    At no time during this meeting did Shakman or the Attorneys mention any problem with the Louisiana Project. Their collective silence, however, proved to be misleading.

47.    Subsequently, in or about June 2011, Shakman informed the Werners that, contrary to the marketing material and the Agreement, he along with the Attorneys had misinterpreted the new AP statute, and that in order for the AP process to be successful the AP lien holder had to rehabilitate the blighted property. This ran contrary to what Shakman and the Attorneys had represented to the Werners.

48.    Following this disclosure, the Attorneys reached out to the Werners and offered to come to New York to discuss the Louisiana Project.

49.    The Werners rejected the Attorneys offer  and since learning about the rehabilitation requirement, the Werners have not spoken with the Attorneys nor have they invested any more money into the Louisiana Project.

**I.    The Werners Demand An Accounting From Shakman**

50.    To date, the Werners have invested $465,000 with Shakman.  With that investment Shakman has allegedly commenced the AP process on 51 properties.

2230983v.9

51.     In addition to the $465,000 investment, and the $64,000 salary to their employee in Louisiana, the Werners have also spent approximately an additional $35,000 in taxes on these 51 properties.

52.     To date, the Werners have lost approximately $564,000, if not more, in the Louisiana Project.

53.     Upon information and belief, of the $9,370 per AP lien, Shakman did no work and spent, at most, $500 per property to run a title search and clear title, which upon information and belief Defendants TTS and TTSL were responsible for, and kept the remaining balance for himself.

54.     Furthermore, Shakman has reneged on his promise to replace any property that was successfully challenged within the AP waiting period, and to date must replace forty (40) properties for the Werners.

55.     As the Werners had serious questions as to how their investment was spent, the Werners demanded an accounting from Shakman.

56.     This request was denied by Shakman, and to date no documents or information have been given to the Werners.

57.     In total the Werners have spent approximately $564,000, if not more, on the Louisiana Project.

11

66.     As a result of Defendant's breach, the Werners suffered damages in an amount to be determined at trial, which amount is no less than $564,000 plus interest therein and the costs and expenses of this action, including reasonable attorney fees.

## SECOND CAUSE OF ACTION

67.     Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

68.     Defendants made fraudulent material promises and misrepresentations as to their experience with the AP process and the ultimate profitability of the AP process.

69.     These statements were made by Defendants in order to induce the Werners to invest in the Louisiana Project.

70.     The Werners did in fact reasonably rely upon these misrepresentations.

71.     At the time of these misrepresentations the Defendants knew that these misrepresentations were false.

72.     As a result of Defendant's misrepresentations, the Werners suffered damages in an amount to be determined at trial, which amount is no less than $564,000 plus interest therein and the costs and expenses of this action, including reasonable attorney fees.

## THIRD CAUSE OF ACTION

73.     Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

2230983v.9

74.    Defendants made material promises and representations as to the AP process and its ultimate profitability.

75.    These statements were made by Defendants in order to induce the Werners to invest in the Louisiana Project.

76.    The Werners did in fact reasonably rely upon these misrepresentations.

77.    These misrepresentations by Defendants were made due the Defendants' own negligence.

78.    As a result of Defendants' misrepresentations, the Werners suffered damages in an amount to be determined at trial, which amount is no less than $564,000 plus interest therein and the costs and expenses of this action, including reasonable attorney fees.

## **FOURTH CAUSE OF ACTION**

79.    Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

80.    The Werners have demanded reimbursement from the Defendants for engaging in acts and/or omissions of waste and mismanagement.

81.    The Defendants intentionally and without authority, assumed and/or exercised control over the Werner's personal property, interfering with their right of possession.

82.    The Werners had a possessory interest in the interfered personal property.

14

83.    Defendants dominion and control over the property significantly interfered with the Werner's possessory interest.

84.    As a result, the Werners suffered damages in an amount to be determined at trial, which amount is no less than $564,000 plus interest therein and the costs and expenses of this action, including reasonable attorney fees.

### FIFTH CAUSE OF ACTION

85.    Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

86.    As the head of the Louisiana Project, and a Principal/owner of TTS and TTSL, Shakman owed the Werners fiduciary duties and obligations.

87.    Upon information and belief, Shakman and the Attorneys incorrectly interpreted the AP statute.

88.    Shakman breached his fiduciary duty to the Werners by, among other things, engaging in actions and/or omissions of waste and mismanagement, and conversion.

89.    As a result of the Shakman's actions, including breach of his fiduciary duty to the Werners, the Werners have been damaged.

90.    Based on the above, the Werners suffered damages in an amount to be determined at trial, which amount is no less than $564,000 plus interest therein and the costs and expenses of this action, including reasonable attorney fees.

15

91.     Further, based on the above, because Shakman's breach of his fiduciary duty to the Werners was intentional, willful and malicious, and was intended to cause harm to the Werners, the Werners are entitled to punitive damages in an amount to be determined at trial, plus interest thereon, together with the costs and disbursements of this action, including reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

92.     The Werners repeat and re-allege the allegations set forth above as if more fully set forth herein.

93.     As the head of the Louisiana Project, and a Principal/Owner of TTS and TTSL, Shakman owed the Werners fiduciary duties and obligations.

94.     The Werners have requested that Shakman account to and reimburse, if necessary, the Werners for engaging in acts and/or omissions of waste and mismanagement, and conversion.

95.     Shakman has failed or refused to account to and reimburse, if necessary, the Werners.

96.     Shakman has failed or refused to provide the Werners with any information and/or documents that illustrate the manner in which the Werners investment was spent.

2230983v.9

97.    Based upon the foregoing, the Werners are entitled to an accounting and respectfully requests that this Court order that such an accounting be conducted and provide the Werners with such other and further relief as may be just and proper.

2230983v.9

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in an amount to be determined at trial, which amount is no less than $564,000 plus interest therein and the costs and expenses of this action, including reasonable attorney fees; punitive damages in an amount to be determined at trial; and order that Shakman provide the Werners with an accounting of their total investment.

Dated:  Great Neck, New York
         September 4, 2012

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiffs*

By: _____
            Andrew L. Zwerling
            Matthew M. Shatzkes
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

18

.

GreenPearl
Events Home

Event Overview

Agenda

Speakers

Attending
Firms

Sponsors

Sponsor this
Summit

Testimonials

Venue

About Us

Registration

Teleconference

# Testimonials

*Most real estate professionals excel in a strong market, but those who understand the challenges and complexities of a distressed market are best educated to excel in future up and down cycles and are better prepared to implement the foundations of preserving, maintaining and maximizing the value of their real estate assets. Don't miss the May 2010 GreenPearl Events' DISTRESSED REAL ESTATE SUMMIT: CHICAGO to better position yourself in a troubled market and successfully navigate through tougher times.*
**—Don Shapiro, President / CEO, Foresite Realty Partners**

*GreenPearl Events' Distressed Real Estate Summit: New York unexpectedly became a great networking opportunity for me. My primary purpose for attending was as a guest speaker in a panel discussion. I ended up speaking with attendees for over an hour after the discussion ended, which resulted in three new clients.*
**— Robert Shakman, Principal, Regents Park, LLC**

*GreenPearl Events' conferences provide the real estate industry with real time information and unparalleled market connections that allow executives to achieve superior results.*
**— Peter Pitsiokos, COO, GYRODYNE**

*Distressed Real Estate Summit: California is a conference designed by and for commercial and residential real estate executives in California and southwest regional markets. The agenda will speak to the issues unique to the west coast: an abundance of distressed hotels and broken condo deals, and the myriad of opportunities in office, retail, multifamily and retail properties and debt. If you work in this region, make plans to attend February 4th to find out how who is selling, and what it takes to get deals done in a distressed environment.*
**—Fred B. Córdova, III** Senior Vice President, COLLIERS ASSET RESOLUTIONS TEAM

*I participated in GreenPearl's New York Distressed Real Estate Conference, and was impressed with the overall turnout and content. I'm attending their February 4th conference in LA as it promises to provide an objective analysis and review of the new state of our industry.*
**—Leslie Lundin, President and Managing Partner, LBG REALTY ADVISORS LLC**

*In these trying times, I always find it beneficial to use all the tools available including meeting with fellow professionals and learning first-hand how to deal with challenges, recognize opportunities and learn what is*

truly happening in the market.
—**Bert Haboucha,** Senior Vice President, ISTAR FINANCIAL INC.

"This may the best time in your lifetime to truly help clients take advantage of the current commercial real estate market. If you don't believe me, attend the Distressed Real Estate Summit–New York City–Sept. 23 and keep your eyes and ears wide open."
—**Jerry Anderson,** SPERRY VAN NESS ASSET RECOVERY TEAM

"Many, if not most, real estate professionals have not experienced a real market down cycle. Many of the issues that will be confronted, and have to be dealt with, in resolving current market challenges are being encountered for the first time and will be addressed at "Distressed Real Estate Summit."
—**Aharon Friedman,** WILDWOOD CAPITAL GROUP

"Networking is a key ingredient in the success of any service provider and the GreenPearl platform is one of the best of its kind. I was a speaker at a recent event and met some people which resulted in my being retained to assist with the sale of a 25 building portfolio. GreenPearl events provide access to key participants in the marketplace."
—**Robert Knakal,** MASSEY KNAKAL REALTY SERVICES

"This year through at least the fourth quarter of 2010 heralds the onset of a truly historical time in the acquisition opportunities presented by the distressed real estate market. The executives at GreenPearl.com have recognized this moment in real estate history and are producing a conference that every serious opportunity fund manager should attend. I will be there!"
—**Howard C. Liggett,** DISTRESSED REAL ESTATE CONSULTING SERVICES, INC.

"Thank you for asking me to speak at the recent Distressed Real Estate Summit. I have spoken at many events over the years and must congratulate your organization, not only for your fine turnout but your organizational ability. At every stage, the event worked like a fine watch: accurate, acutely tuned, and well-oiled."
—**Ian J. Schnurman,** ZALMAN & SCHNURMAN

"Thank you for hosting a really informative, fun event in a great setting with great speakers. The panelists you assembled, all dynamic leaders in the green building industry, presented a wealth of insights and knowledge. For someone like me looking to learn more about the various avenues of this industry it was time well spent."
—**Pat Parker,** PATRICK PARKER REALTY

"Kennedy Funding has sponsored and attended numerous Greenpearl events. Each event continues to surprise us and bring great connections and business. I highly recommend each event to any company who wants to see a fast return on investment."
—**Stephen Bienko,** KENNEDY FUNDING

"It was great to see everyone and great to shake hands with the best and brightest in the industry. The Distressed Real Estate Summit just puts everything in perspective. Although we read a lot and go to a lot of conferences, the Distressed Real Estate Summit puts it all together."

**—Joe Berko,** BERKO & ASSOCIATES

*"We are very happy. The GreenPearl team put on a great event. We met a lot of very qualified clients that we're looking forward to doing business in the future. We look forward to more GreenPearl events in the future."*
**—Brian Tormey,** TITLEVEST / 1031VEST / INSUREVEST

**Copyright 2009 GreenPearl.com    All Rights Reserved**

**About GreenPearl Events:**

GreenPearl organizes and promotes high-quality real estate events including networking mixers, training, teleconferences, panel discussions and larger expos and summits. To be added to our mailing list to receive information about real estate events in the greater New York City area, send an email with your contact information to: events@greenpearl.com, or visit http://greenpearl.com/events.

§ 5633. Blighted property; acquisitive prescription, LA R.S. 9:5633

West's Louisiana Statutes Annotated
  Louisiana Revised Statutes
    Title 9. Civil Code Ancillaries
      Code Book III. Of the Different Modes of Acquiring the Ownership of Things
        Code Title XXIV. Prescription (Refs & Annos)
          Chapter 1. Prescription (Refs & Annos)
            Part I. Periods of Prescription
              Subpart B-1. Three Years

LSA-R.S. 9:5633

§ 5633. Blighted property; acquisitive prescription

Currentness

A. Ownership of an immovable may be acquired by the prescription of three years without the need of just title or possession in good faith. The requirements for the acquisitive prescription of three years are as follows:

(1) The land and all improvements thereon shall be located in a municipality having a population of three hundred thousand or more, according to the latest federal decennial census, and shall have been declared or certified blighted after an administrative hearing, pursuant to R.S. 13:2575 or 2576.

(2) The following shall be filed in the conveyance records for the parish where the immovable property is situated:

(a) An affidavit by the possessor stating the name and address of the possessor, stating the intention of the possessor to take corporeal possession of the immovable property for the possessor's own account in accordance with this Section, stating that such corporeal possession shall commence no sooner than sixty calendar days from the date of filing of the affidavit and giving a short legal description of the immovable property intended to be possessed; and

(b) There shall be annexed to and filed with the affidavit described in Subparagraph (A)(2)(a) of this Section a certified copy of the judgment declaring or certifying the property as blighted and the following certificate or proof:

(i) In the event an appeal has not been timely filed in the district court appealing the judgment or declaration of blight, a certificate of the clerk of court of the district court showing that thirty days have elapsed since the date of the judgment or declaration of blight and certifying that an appeal has not been filed in the district court appealing the judgment or declaration of blight; or

(ii) In the event an appeal has been timely filed in the district court appealing the judgment or declaration of blight, a certificate of the clerk of court certifying that the district court has affirmed the judgment declaring or certifying the property as blighted or the case has been abandoned and showing that more than sixty days have elapsed from either:

(aa) The expiration of the delay for applying for a new trial or judgment notwithstanding the verdict, as provided by Code of Civil Procedure Articles 1974 and 1811, and certifying that such application was not filed within such delays as allowed by law, or

(bb) The date of the mailing of notice of the refusal of the district court to grant a timely application for a new trial or judgment notwithstanding the verdict as provided by Code of Civil Procedure Article 1914, in the event an application for a new trial or judgment notwithstanding the verdict was timely filed as provided by Code of Civil Procedure Articles 1974 and 1811; and further certifying that no order has been rendered or signed by such district court allowing an appeal from such judgment of the district court to the respective appellate court of this state.

(iii) If, within the time allowed by Code of Civil Procedure Article 2087 or 2123, an order is rendered or signed by such district court allowing an appeal from the judgment of the district court to the respective appellate court of this state, a certificate of

§ 5633. Blighted property; acquisitive prescription, LA R.S. 9:5633

the clerk of the court of appeal certifying either that the appeal has been abandoned, or that the judgment of the court of appeal affirming the district court has become final and definitive in accordance with Code of Civil Procedure Article 2166 may be filed in lieu of the certificate required by Item (A)(2)(b)(i) or (ii) of this Section.

(iv) In the event the Supreme Court of Louisiana grants an application for certiorari to review such judgment of the court of appeal, written proof that the Supreme Court of Louisiana has affirmed such judgment of the court of appeal and that a writ of certiorari to the United States Supreme Court has not been made within the time allowed for such application may be filed in lieu of the certificates required by Item (A)(2)(b)(i) or (ii) of this Section.

(v) In the event an application for certiorari to review such judgment of the Supreme Court of Louisiana is timely filed, proof that such application was denied may be filed in lieu of the certificates required by Item (A)(2)(b)(i) or (ii) of this Section.

(vi) In the event the United States Supreme Court grants an application for certiorari to review such judgment of the Supreme Court of Louisiana, written proof that the United States Supreme Court has affirmed such judgment of the Supreme Court of Louisiana may be filed in lieu of the certificates required by Item (A)(2)(b)(i) or (ii) of this Section.

(vii) In the event the clerk of the district court fails or refuses to issue any certificates required by this Section within ten days following a written request for same, the requesting party may cause the clerk of court to be cited summarily by a court of competent jurisdiction to show good cause why the certificate has not been issued. If the court shall deem that good cause has not been shown, the clerk of court shall pay all reasonable attorney fees and costs incurred by the party bringing such rule.

(c) An affidavit by the New Orleans Redevelopment Authority stating that all appeals and appeal delays have run, and that the judgment declaring or certifying the property as blighted is final, filed together with a copy of the judgment declaring or certifying the property as blighted prior to August 29, 2005, shall satisfy the requirements of Subparagraph (A)(2)(b) and Paragraph (A)(11) of this Section. However, any property acquired pursuant to this Subparagraph by the New Orleans Redevelopment Authority and which is still in its possession on or after January 1, 2010, shall again become subject to the provisions of Paragraph (A)(11) of this Section.

(3) Within one week after the judgment, certificate or proof and affidavit are filed as described in Paragraph (A)(2) of this Section, said judgment, certificate or proof and affidavit shall be sent certified mail, return receipt requested, to the address of the owner shown on the tax rolls of the assessor, to the addresses of owners of immovable property having common boundaries with the immovable shown on the tax rolls of the assessor and to all parties having an interest in the immovable, as shown by the mortgage and conveyance records, at the address of each party as may be reasonably ascertained.

(4) Within one week after the judgment, certificate or proof and affidavit are filed as described in Paragraph (A)(2) of this Section, a notice shall be affixed in a prominent location on the immovable, stating the name and address of the possessor, stating that the possessor intends to take corporeal possession of the immovable for the possessor's own account and stating the date that the notice is so affixed.

(5) An owner of immovable property having common boundaries with the immovable shall have a first right of possession to such immovable. In the event more than one owner of immovable property having common boundaries with the immovable files the judgment, certificate or proof and affidavit as described in Paragraph (A)(2) of this Section, the owner of property having common boundaries who first files the judgment, certificate or proof, and affidavit as described in Paragraph (A)(2) of this Section shall secure the first right to assert possession of the immovable. An owner of immovable property having common boundaries with the immovable may, within the earlier of thirty days of receipt or forty-five days of mailing of the notice required by Paragraph (A)(3) of this Section, file the judgment, certificate or proof and affidavit as described in Paragraph (A)(2) of this Section, fulfill all requirements of Paragraphs (A)(3) and (4) and notify the intended possessor of his own intent to possess the immovable in writing by certified mail, return receipt requested. The owner of immovable property having common boundaries with the immovable shall adhere to the time restraints of the provisions of this Section, and the original intended possessor's time limits shall be suspended during the time the owner of immovable property having common boundaries with the immovable is attempting to assert possession. If the owner of immovable property having common boundaries with the

§ 5633. Blighted property; acquisitive prescription, LA R.S. 9:5633

immovable does not comply with the provisions of this Section, then the original party who filed the judgment, certificate or proof and affidavit as described in Paragraph (A)(2) of this Section shall exclusively have thirty days from the failure of the owner of immovable property having common boundaries with the immovable to comply to reassert his intention to possess the immovable by complying with all provisions of this Section, except that notice to the owners of property having common boundaries with the immovable property shall not be again required. After this exclusive thirty-day period has elapsed, any interested party may avail themselves of the provisions of this Section.

(6) Within ninety calendar days after the date on which the affidavit described in Subparagraph (A)(2)(a) of this Section is filed in the conveyance records as required by Paragraph (A)(2) of this Section, the possessor shall request from the recorder of mortgages a mortgage certificate, setting forth the full legal description of the immovable property, to be run in the name of the owner of the immovable property for a period of time commencing with the date of the acquisition of the immovable property by the said owner and ending sixty days following the date of the filing of the affidavit described in Subparagraph (A)(2)(a) of this Section.

(7) The possessor shall take corporeal possession peaceably and no sooner than the date the mortgage certificate described in Paragraph (A)(6) of this Section is generated by the recorder of mortgages and no later than sixty calendar days following the date of such generation.

(8) The following shall be filed in the conveyance records for the parish where the immovable property is situated within ten days after the possessor has taken corporeal possession of the immovable property:

(a) An affidavit by the possessor stating the name and address of the possessor, stating that the possessor has taken corporeal possession of the immovable for the possessor's own account, stating the date that the possessor took corporeal possession, stating the acts taken by the possessor to effect corporeal possession, and giving a short legal description of the immovable; and

(b) There shall be annexed to and filed with the affidavit described in Subparagraph (A)(8)(a) of this Section the mortgage certificate of the recorder of mortgages described in Paragraph (A)(6) of this Section, showing that sixty days have elapsed from the date of the filing of the affidavit described in Subparagraph (A)(2)(a) of this Section and showing that no notice of lis pendens has been filed against the immovable property and that the immovable property has not been seized under a writ of fieri facias or seizure and sale.

(9) Within one week after the affidavit and certificate are filed as described in Paragraph (A)(8) of this Section, said affidavit and certificate shall be sent certified mail, return receipt requested, to the address of the owner shown on the tax rolls of the assessor and to all parties having an interest in the immovable, as shown by the mortgage and conveyance records, at the address of each party as may be reasonably ascertained.

(10) Within one week after the affidavit and certificate are filed as described in Paragraph (A)(8) of this Section, a notice shall be affixed in a prominent location on the immovable, stating the name and address of the possessor, stating that the possessor has taken corporeal possession of the immovable for the possessor's own account, and stating the date that the possessor took corporeal possession.

(11) All ad valorem taxes, interest, and penalties due and payable shall be paid in full.

(12) If there are any improvements on the immovable, they shall be demolished or certificates of use and occupancy shall be obtained within two hundred seventy calendar days after the date that corporeal possession was taken.

B. In the event a judgment is rendered finding that a violation of any public health, housing, fire code, environmental or historic district ordinance of the municipality where the property is situated has occurred with respect to the immovable after the date that the possessor took corporeal possession, or should any possessor seeking to acquire hereunder fail to satisfy any of the requisites for acquisitive prescription listed in Subsection A of this Section, then possession and the running of prescription and the effect of the affidavits hereunder shall cease, and all rights which may have accrued thereunder shall be null and void ab initio. The fact that there has been no judgment rendered finding that any such violation has occurred on the immovable

after the date that the possessor took corporeal possession may be established by an affidavit of a hearing officer appointed pursuant to R.S. 13:2575 or 2576.

C. The possessor may not demolish any structure on the immovable unless the hearing officer appointed pursuant to R.S. 13:2575 or 2576 finds the structure to be a public nuisance and unless the possessor obtains all permits required by law. Any garage, shed, barn, house, building, or structure shall be deemed to be a public nuisance if:

(1) By reason of being dilapidated, decayed, unsafe or unsanitary, it is detrimental to health, morals, safety, public welfare, and the well-being of the community, endangers life or property or is conducive to ill health, delinquency, and crime.

(2) It is a fire hazard.

(3) By reason of the conditions which require its continued vacancy, it and its surrounding grounds are not reasonably or adequately maintained, thereby causing deterioration and creating a blighting influence or condition on nearby properties and thereby depreciating the value, use, and enjoyment to such an extent that is harmful to the public health, welfare, morals, safety, and the economic stability of the area, community, or neighborhood in which such a public nuisance is located.

D. If the possessor has met the requisites listed in Subsection A of this Section, the possessor shall not be liable to the owner of the immovable for any tortious act related to the possession of the possessor which may have occurred on or after the date that corporeal possession was taken, including but not limited to trespass and demolition of the improvements, and such possessor shall not be subject to criminal prosecution for trespass upon the immovable or for demolition of the improvements. However, nothing provided in this Subsection shall prevent the owner from instituting and prosecuting a real action against the possessor pursuant to Code of Civil Procedure Article 3651 et seq.

E. (1) In the event that the owner is successful in bringing a real action against the possessor pursuant to Code of Civil Procedure Article 3651 et seq., the owner shall reimburse the possessor for all monies advanced by the possessor for attorney fees and costs, tax statements or researches, mortgage or conveyance certificates, title abstracts, filing fees, postage, copies, printing, the payment or satisfaction of mortgages, judgments, liens, and other encumbrances, plus costs and expenses for cancellation thereof, and for all ad valorem taxes, interest, and penalties paid by the possessor on the immovable, the value of the improvements made or done on the immovable by the possessor after the date that corporeal possession was taken, and the cost or value of any repairs, rehabilitation, maintenance, removal, or demolition to the extent not otherwise included in the value of the improvements and for any other reasonable costs incurred or work done by the possessor in connection with the acquisitive prescription provided for in this Section.

(2) In addition to the foregoing reimbursements, all monies advanced by the possessor shall earn, and the possessor shall be entitled to receive, conventional interest at the highest rate allowed pursuant to Civil Code Article 2924(C).

(3) To prove the cost or value of repairs, rehabilitation, maintenance, removal, or demolition made or done on the immovable, the possessor shall provide written receipts for the payments of said costs from the persons who performed the work or from whom the materials were purchased or affidavits establishing the hourly rate generally charged for such work in the parish in which the immovable subject to possession pursuant to this Section is located and the number of hours spent on such work.

(4) In the event that the owner contests the validity of such documentation, appraisers shall be appointed and shall proceed in the manner set forth in R.S. 47:2223 to determine the cost or value of said repairs, rehabilitation, maintenance, removal, or demolition.

F. If the possessor has met the requirements set forth in Subsection A of this Section, all expenses and monies itemized in Subsection E of this Section advanced by the possessor, plus all accrued interest as provided by Subsection E of this Section, shall be secured by a first lien and privilege on the immovable property described in the affidavit filed under Subparagraph (A) (2)(a) of this Section, which lien shall be superior in rank to all prior and subsequent recorded mortgages, judgments, liens, privileges and security interests. Such lien shall be in favor of the possessor and, as such, it may be pledged or assigned to secure any loan or loans made to the possessor for the purpose of financing the acquisition of the immovable property by the

§ 5633. Blighted property; acquisitive prescription, LA R.S. 9:5633

acquisitive prescription provided for in this Section or for the rehabilitation, demolition or for the construction of improvements on or to the immovable property, or both.

G. (1) If the possessor or possessors of any immovable property possessed pursuant to this Section have met the requirements of Paragraphs (A)(1) through (A)(10) of this Section, the holder or holders of any mortgage, lien, privilege, judgment, or security interest encumbering the immovable property described in the affidavit provided for in Subparagraph (A)(2)(a) of this Section, may not enforce such mortgage, lien, privilege, judgment, or security interest by seizure and sale or other in rem action against such immovable property, and such mortgage, lien, privilege, judgment, or other security interest shall have no effect whatsoever against such immovable property, the possessor thereof under this Section, or any other third party while the possessor or possessors are in corporeal or civil possession of the immovable, and the effect of recordation of the document creating the security interest shall cease as to the immovable upon the possessor acquiring the property by the acquisitive prescription described in this Section. Notwithstanding the foregoing, if the possessor does not comply with the requisites of Paragraphs (A)(11) and (12) of this Section or if a judgment described in Subsection B of this Section is rendered, the enforcement of a security interest shall no longer be prohibited.

(2) Paragraph (G)(1) of this Section shall not apply to liens imposed by or in favor of the municipality or parish in which the immovable property is located.

(3) Upon presentation of evidence to the clerk of court or the recorder of mortgages attached to or made part of an affidavit of any interested party that a possessor under this Section has met all the requirements of this Section and has acquired immovable property pursuant to this Section, the clerk of court or the recorder of mortgages shall cancel and erase all mortgages, judgments, liens, privileges, and security interests, from the records of his office, except liens imposed by or in favor of the municipality or parish in which the immovable property is located.

H. The provisions governing acquisitive prescription of ten years and of thirty years apply to the prescription of three years to the extent that their application is consistent with the prescription of three years.

I. Notwithstanding the provisions of Subsection A of this Section, in the event that the possessor rehabilitates or constructs a residential or commercial structure in accordance with Paragraph (A)(12) of this Section, ownership of the immovable may be acquired by prescription without the need of just title or possession in good faith on the date that a certificate of use and occupancy shall be obtained by the possessor. For the purposes of this Subsection, "residential or commercial structure" shall not include garages, sheds, barns, or other outbuildings.

J. In the event that the possessor does not comply with the provisions of Subsection A of this Section or if a judgment described in Subsection B of this Section is rendered, any interested party may execute and file in the conveyance records an affidavit describing the instance or instances of the possessor's failure to comply with the provisions of Subsection A of this Section or may file in the mortgage records a certified copy of the notice of the judgment described in Subsection B of this Section. Said filed affidavit or filed certified notice of judgment shall be conclusive evidence of the failure of the possessor to comply with the requirements necessary to acquire the immovable by the prescription provided for in this Section and shall act to nullify the filed affidavit of intent to possess described in Paragraph (A)(2) of this Section and the filed affidavit of possession described in Paragraph (A)(8) of this Section as if the said affidavits were never filed, without any need to have said affidavits canceled or released of record.

K. The filing or depositing in the conveyance or mortgage records of any forged affidavit, notice of judgment, certificate or proof, or mortgage certificate described herein, wrongfully altered affidavit, notice of judgment, certificate or proof, or mortgage certificate described herein, or any affidavit, notice of judgment, certificate or proof, or mortgage certificate described herein containing a false statement or false representation of a material fact, shall be a felony pursuant to R.S. 14:133 and shall be actionable under Civil Code Article 2315. Notwithstanding the foregoing, a possessor may not file an action against a third person who has acquired an interest in an immovable by onerous title from a person who has acquired the immovable by the acquisitive prescription provided by this Section based upon an executed or filed false affidavit, notice of judgment, certificate or proof, or mortgage certificate described herein.

§ 5633. Blighted property; acquisitive prescription, LA R.S. 9:5633

**Credits**

Added by Acts 2001, No. 1226, § 1. Amended by Acts 2003, No. 1188, § 1, eff. July 3, 2003; Acts 2006, 1st Ex.Sess., No. 30, § 1; Acts 2011, 1st Ex.Sess., No. 30, § 1.

LSA-R.S. 9:5633, LA R.S. 9:5633
Current through the 2011 First Extraordinary and Regular Sessions.

---

End of Document © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# *Acquisitive Prescription New Orleans Parish Louisiana*

## <u>Tax Liens & Tax Deeds – Basic Overview</u>

Tax Liens and Tax deeds and redeemable tax deeds are sold by county governments because they must raise the short fall of the property tax money needed to run the schools, pay the police & fire departments and service the county. The yearly amount of unpaid property taxes is $6 to $12 Billion.

There are approximately 5 to 7 million properties each year where the property owner doesn't pay the property tax on time. This is rising and will continue to rise due to the current high mortgage default foreclosure market. The counties sell the unpaid property tax liens, tax deeds, redeemable tax deeds, assignments and foreclosure properties to investors.

The tax lien controls the entire property including the land & dwellings until it is redeemed or foreclosed upon.

Five percent of the tax liens result in tax deeds: the annual secondary market for these assets is $600 Million. In addition, other taxing authorities sell only tax deeds (REO) to investors at the rate of roughly $900 million per year. Half of both supply lines are worthless properties resulting in a market of available, attractive purchases of $1.5 billion per year.

Tax Liens are a more complicated asset class than mortgages and therefore sell for a lower percentage of value. At an average price-to-value ratio of 20%, the market for tax deeds will represent $7.5 billion in real estate value.

# *Acquisitive Prescription*
## *NEW ORLEANS PARISH*

Other foreclosure related distressed assets and property acquisition opportunities may arise from federal, state, county, and city governments. Such an opportunity now exists within the Parish (County) of New Orleans.

Hurricane Katrina was considered the most economically devastating natural disaster in United States history. Evidence of that horrific event can still be seen on almost any street in New Orleans.

The properties that still litter the streets, unrepaired or abandoned, are classified as "blighted". It is estimated that there are over 20,000 blighted properties in New Orleans parish. It is these properties that represent an unprecedented opportunity for the sophisticated investor. Up until now most investors would not touch blighted properties as no company would underwrite title insurance.

The process of Acquisitive Prescription is similar to Conspicuous or Adverse Possession. Simply, the investor files documents with the court which creates a lien interest in the property. There is a redemptive period of 60 days in which the owner or any interested party may redeem the investor's interest. They would then be immediately responsible for any encumbrances that previously existed on the property.

Once the 60 day period has expired and no challenge has been brought forth the investor acquires a title interest to the property and any encumbrance, with the exception of property tax has been eliminated. At this point Tax Title Services will cure any defects to the title and provide a title insurance policy through First American Title.

# *Advantages of Acquisitive Prescription v. Traditional Tax Liens/Deeds.*

- **Virtually no competition**
- **>20,000 properties currently available**
- **\*Acquire without competitive bidding**
- **Acquisition cost of any property regardless of market value is $9,370.00**
- **If for some reason a successful challenge occurs after the 60 day period and before curing of title the investor is entitled to all costs and betterments at a rate of 17% per annum.**
- **Ability to pre-determine the "as-is" value of a property provides the option of sale to a wholesale investor or rehabilitation and sale into the retail market.**
- **Visual photographic access to the property inside and out before committing to acquisition.**
- **Most properties in the blight program have been completely gutted by the city at their expense.**

**\*Anyone who has participated in Tax Deed or Lien sales knows the frustration of researching properties, figuring out maximum bid levels of acceptable risk and then being out bid at the last minute. Your investment funds sit dormant until the next sale.**

**Even worse, you are in a court battle with the current occupant who, after dragging out the eviction process, adopts a scorched earth policy of destruction which dramatically reduces your profit margin.**

# *Questions and Answers*

**- What is the recommended amount of pooled funds needed for the Acquisitive Prescription Program?**

After consulting with various institutional servicer clients & regional clients of ours, and taking into consideration time value, a $100,000 minimum fund is recommended to adequately purchase properties. This may or may not include rehabilitation cost depending upon the investor's strategic plan.

**- What is the management purchasing and servicing fee to be charged?**

The Program is simple.

There are no load fees.

Acquisition price is $9.370.00/property

Title clearing/curing costs ~$2,500 - $3,500+

The investor decides whether to rehab and sell into the retail market or sell "as is" to the investor market.

All rehab costs are the responsibility of the investor

**What is the estimated return on investment?**

All capital costs are returned to the investor through proceeds of the sale. The investor receives their capital costs + 40% of profit. This is per deal not per annum. It is possible to repeat this process 2 – 3 times per year.

**- Once committing capital to a specific property what is the estimated amount of time to have it on the market for sale?**

If the property is vacant land or you choose not to rehab an improved property the average time would be approximately 75 – 120 days. With a rehab property it will take approximately 120 days.

## PURCHASE OF ACQUISITIVE PRESCRIPTION LIENS/DEEDS

Per our discussion here is the general outline of the agreement.

- Client would facilitate a fund in the amount of $100,000+ for the purpose of purchasing tax liens/deeds in the state of Louisiana.

- Shakman/NOLA Redevelopment, LLC would research, evaluate and recommend certain parcels for purchase.

- All parcel recommendations may be reviewed and approved by Client before purchase. Once the property has completed the 60 day Acquisitive Prescription program, Tax Title Services will cure the title. The property will be sold "As-Is" or the property will be rehabilitated and sold into the retail market. All proceeds due Client would be paid directly out of escrow from the sale of property.

## FEES & DIVISION OF PROCEEDS

- No load fees

- All properties acquired through Acquisitive Prescription cost $9,370.00.

- All title related costs would be the responsibility of the Client.

- Any rehab costs would be the responsibility of the Client.

- Once the property is sold Client is paid all its capital costs + 40% of profit.

Agreed upon this day

_____(Name/Date)

Client

_____(Name/Date)

Robert Shakman/ NOLA Redevelopment, LLC

# ACQUISITIVE PRESCRIPTION

# PROCESS MAP

**RESEARCH LIST OF QUALIFIED BLIGHT PROPERTIES**

↓

**CONDUCT VISUAL INSPECTION (INSIDE/OUTSIDE)**

**OBTAIN PICTURES OF PROPERTY**

**COMPETETIVE MARKET ANALYSIS OF PROEPRTY**

**("AS-IS" COMPARED TO AFTER REHAB VALUE)**

↓

**1. FILE AFFADAVIT OF INTENT TO POSSESS**

**2. SEND NOTIFICATION TO ALL INTERESTED PARTIES**

↓

**BEGIN 60 DAY ACQUISITIVE PRESCRIPTION PROCESS**

↓

**POST 60 DAY PRESCRIPTIVE PERIOD**

**1. OBTAIN MORTGAGE CERTIFICATE**

**2. PLEDGE OF LIEN RIGHTS**

**3. FILE AFFADAVIT OF POSSESSION**

**4. ORDER BULDING PERMIT**

**5. CONDUCT SECOND ROUND OF NOTIFICATION(APPROX. 30 DAYS)**

**6. RECORD CONSTRUCTION REHAB CONTRACT**

↓

**SELL PROPERTY "AS IS" OR REHAB FOR RETAIL SALE**

.

## PURCHASE OF ACQUISITIVE PRESCRIPTION LIENS/DEEDS

Per our discussion here is the general outline of the agreement.

- Client would facilitate a fund in the amount of $100,000+ for the purpose of purchasing tax liens/deeds in the state of Louisiana.
- Shakman/NOLA Redevelopment, LLC would research, evaluate and recommend certain parcels for purchase.
- All parcel recommendations may be reviewed and approved by Client before purchase. Once the property has completed the 60 day Acquisitive Prescription program, Tax Title Services will cure the title. The property will be sold "As-is" or the property will be rehabilitated and sold into the retail market. All proceeds due Client would be paid directly out of escrow from the sale of property.

## FEES & DIVISION OF PROCEEDS

- No load fees
- All properties acquired through Acquisitive Prescription cost $9,370.00.
- All title related costs would be the responsibility of the Client.
- Any rehab costs would be the responsibility of the Client.
- Once the property is sold Client is paid all its capital costs + 40% of profit.

Agreed upon this day

_Mark A. Calene_ _____  _11/28/10_ (Name/Date)
Client

_R_____  _11/29/10_ (Name/Date)
Robert Shakman/ NOLA Redevelopment, LLC

Please confirm that the properties in the Werner's portfolio which are a loss will be replaced with new properties per conversation between the Werner's and you. If so, the following properties are targeted as a loss per the BPOs that were completed. ****

   ****

*Property Address 1*****

*Property Address 2*****

*Est. P&L w/ Liens*****

*Status*****

*2527 Palmyra Street*****

*New Orleans, LA 70119*****

$       (6,740)****

Ready for Possession****

*3338 Desaix Blvd*****

*New Orleans, LA 70119*****

$       (7,205)****

Filed-60 Day Wait****

*4641 St. Anthony Avenue*****

*New Orleans, LA 70122*****

$          577 ****

Filed-60 Day Wait****

*5418-5418 1/2 Marigny Street*****

*New Orleans, LA 70122*****

$    (8,366)****

Filed-60 Day Wait****

   ****

Would it be possible to have these properties replaced with 4 of the 11 that are ready for payment?****

   ****

Thanks!!****

   ****

*Tiffany Cone*****

*Vision Management, Inc.*****

*Main: (407) 468-9221*****

   ****